# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KIMBERLY LUELLEN, on behalf of herself and on behalf of the estate her deceased son MARTESE TATE,

                  Plaintiff,

      v.

THE CITY OF CHICAGO, CHICAGO POLICE OFFICER DAVID (#18491), OFFICER VALDEZ (#8868), and J. DOE CPD OFFICERS 1-5,

                  Defendants.

No.

Judge:

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff KIMBERLY LUELLEN, and KIMBERLY LUELLEN on behalf of the estate of her deceased son MARTESE TATE, referred to throughout as "Plaintiff Luellen" and "Plaintiff Tate," by and through their attorneys at First Defense Legal Aid, complains against the Defendants, THE CITY OF CHICAGO, OFFICER AARON DAVID (Star #18491), OFFICER CHRISTOPHER VALDEZ (Star #8868), and J. DOE CPD OFFICERS 1-5 as follows:

## INTRODUCTION

1.  This civil action is brought pursuant to 42 U.S.C. § 1983 to address deprivations of Plaintiffs' rights under the Constitution of the United States.

2.     This action is brought in response to multiple, related incidents in which members of the Chicago Police Department terrorized Plaintiff Kim Luellen and her recently-deceased son Plaintiff Martese Tate, and violated their fundamental rights.

3.     On March 6, 2020 Defendant Officers David and Valdez violently kicked down the door to Plaintiff Luellen's home and entered unannounced, without consent, without a warrant, and without exigent circumstances—wholly lacking any legal justification.

4.     Plaintiff Tate, Plaintiff Luellen's son, entered a comatose state on July 7, 2020 for reasons unrelated to the facts and claims stated herein. After he became comatose, Defendant Doe Officers unjustifiably retrieved his private medical information, and upon discovering the tragic fact that he was on life support, the officers proceeded to compile this information into sensitive and inflammatory law enforcement records. Defendant Doe Officers shared these records containing Plaintiff Tate's private information and aspersions as to his character with the public, which, when she discovered them on Facebook on December 24, 2020, cruelly compounded Plaintiff Luellen's trauma, violating both his and her rights. These records spread widely, including to Plaintiff Luellen's daughter's CPS class.

**JURISDICTION AND VENUE**

5.     The jurisdiction of this Court is invoked pursuant to the Civil Rights Act, 42 U.S.C. § 1983; the Judicial Code, 28 U.S.C. §§ 1331 and 1343(a); the Constitution of the United States; and supplemental jurisdiction for state claims as provided in 42 U.S.C. § 1367(a).

6.     Venue is proper pursuant to 28 U.S.C. § 1391(b). The events alleged within all occurred in the Northern District of Illinois.

## PARTIES

7.      At all times mentioned herein KIMBERLY LUELLEN ("Plaintiff Luellen") was and is a United States citizen who resides in the Northern District of Illinois.

8.      At all times herein mentioned, Plaintiff MARTESE TATE ("Plaintiff Tate"), a minor on the date of Incident 1, March 2020, and now deceased, by and through his mother KIMBERLY LUELLEN on behalf of his estate, was a citizen of the United States and a resident of the Northern District of Illinois.

9.      At all times herein mentioned, Defendants Chicago police officers DAVID (Star #18491) and VALDEZ (Star #8868) were employed by the City of Chicago Police Department, and were acting under color of state law and as the employees, agents, or representatives of the City of Chicago Police Department. These Defendants are being sued in their individual capacities.

10.     At all times herein mentioned, J. DOE CPD OFFICERS 1-5 were employed by the City of Chicago Police Department and were acting under color of state law and as the employees, agents, or representatives of the City of Chicago Police Department. These Defendants are being sued in their individual capacities. Upon discovery of their identities, Plaintiff will seek leave to amend the Complaint to add them as Defendants. They are referred to within as "Defendant Doe Officers."

11.     At all times herein mentioned, the CITY OF CHICAGO was a municipal corporation of the State of Illinois, existing as such under the laws of the State of Illinois. At all relevant times, the CITY OF CHICAGO maintained, managed, and/or operated the City of Chicago Police Department, and is the employer and principal of the police officer defendants.

## THE FIRST INCIDENT (COUNTS I- III and XI-XII)

12.     Plaintiff Kimberly Luellen, in her individual capacity and as representative of her deceased son, Plaintiff Martese Tate, are a mother and son who on March 6, 2020 resided in a home located at 1234 S. Sawyer Ave., Chicago, Illinois, 60623.

13.     On March 6, 2020 Plaintiff Luellen and her son Plaintiff Tate were inside the sanctity of their home with all doors closed.

14.     At one point in the afternoon, a friend of Plaintiff Tate's knocked on the back door of 1234 S. Sawyer Ave. and entered the home.

15.     All doors remained closed and Plaintiff Tate and his teenage friends were gathered in the kitchen and Tate's bedroom for some time.

16.     Plaintiff Martese Tate and his teenage friends are all Black children.

17.     At this time, Plaintiff Kimberly Luellen was in her bedroom resting in a nightgown with her sleeping infant daughter.

18.     That same afternoon, Defendant Officers David and Valdez received an anonymous tip about a theft of a woman's cell phone and car keys.

19.     Officer David and Officer Valdez arrived on the block where the alleged robbery had taken place.

20.     The only available description provided to officers was "a juvenile wearing a headband."

21.     No further identifying details, such as race, hairstyle, weight, height, or name were made available to Officer David or Officer Valdez.

22.     After interacting with a complaining witness for fewer than five seconds, Officer David and Officer Valdez began running through an open plot of land adjacent to Sawyer Avenue.

23.     Officer David ran through the open lot and an alley for about 30 seconds, and his body-worn camera ("BWC") depicts no individuals in sight.

24.     Officer David then stopped running, looked around, and again with no individuals in sight began to run in the opposite direction, back towards his starting point.

25.     At this point, Officer David, jogging, turned down an alley, and, recognizing Plaintiff Luellen's house, made a targeted bee-line towards it.

26.     Officer David and Officer Valdez knew that Plaintiff Luellen and Plaintiff Tate lived there by virtue of a prior interaction.

27.     As seen on Officer David's BWC, the door to Plaintiff Luellen's home was closed at the time of his approach. At no point did Officer David observe anyone enter the home.

28.     As seen on Officer David's BWC, no one exited the home, and, further, no one could be seen near the home.

29.     No suspect appears on Officer David's BWC at any point.

30.     Defendant Officer David, followed closely by Officer Valdez, entered the gate to Plaintiff Luellen's backyard at a high speed, rushed the stairs to the house and violently kicked open Plaintiff Luellen's back door.

31.     On information and belief, Defendant Officers are familiar with this neighborhood and the individuals who live there.

32.     Defendant Officers knew that Plaintiff Luellen, Plaintiff Tate, and what Defendant Officers later referred to as "their crew" were all Black individuals.

33.     Despite knowing that the alleged suspect could have been any race, Defendant Officers exclusively targeted Plaintiffs' home.

34.     Despite the only description available being "a juvenile in a headband," Defendant Officers did not target and kick down the door of any White individuals' homes.

35.     Defendant Officers engaged in racially biased policing, consistent with and caused by the Chicago Police Department's systemic, unofficial policy, custom, and practice of policing based on racial profiling and racialized animus.

36.     As they kicked in the back door, Defendant Officers David and Valdez forcefully entered Plaintiff Luellen's home, without knocking, announcing their presence, or asking for consent.

37.     Defendant Officers broke Plaintiff Luellen's door when they kicked it open.

38.     At the time Defendant Officers David and Valdez brazenly entered Plaintiff Luellen's home, they did not have a search warrant, arrest warrant, or any other lawful authority to make such entry.

39.     Plaintiff Luellen, who was resting with her infant daughter, and her teenage son Plaintiff Tate, who was standing in the kitchen, posed no apparent, actual or possible threat to the officers whatsoever.

40.     Plaintiff Luellen grabbed her infant child into her arms from fear and shock at the sudden and violent entry of strangers into her home.

41.     Neither Officer David nor Officer Valdez were aware of any facts creating exigent circumstances to enter Plaintiff Luellen's home without a warrant or consent.

42.     There were no facts creating exigent circumstances to enter Plaintiff Luellen's home without a warrant or consent.

43.     The Officers' warrantless entry into Plaintiff Luellen's home, wholly lacking probable cause or exigent circumstances, was not a rogue or isolated event: it was undertaken pursuant to and caused by the City of Chicago's systemic, unofficial policy of violating Black individuals' Fourth and Fourteenth Amendment rights.

44.     As a direct and proximate result of the Officers' actions, Plaintiff Luellen has experienced lasting mental anguish, emotional trauma, panic attacks, paralyzing fear of the police, other physiological suffering, and other consequences that continue to negatively impact her life.

**THE SECOND INCIDENT (COUNTS IV-XII)**

45.     On July 7, 2020 Plaintiff Ms. Kimberly Luellen's teenage son, Plaintiff Martese Tate, suffered a medical emergency and was pronounced brain dead and placed on life support.

46.     At the time of his brain death, Plaintiff Tate was a minor.

47.     Plaintiff Tate was on life support from July 7, 2020 until his death on July 21, 2021.

48.     After he entered a coma, Defendant Doe Officers researched and retrieved Plaintiff Tate's sensitive medical status.

49.     Neither Plaintiff Tate nor his mother Plaintiff Luellen consented to Defendant Doe Officers intruding into their privacy and retrieving this confidential information.

50.     Plaintiffs did not know that Defendant Doe Officers had gathered Plaintiff Tate's sensitive and private medical information.

51.     While Plaintiff Tate was in a coma, the Doe Defendants created an internal law enforcement document titled "Juvenile Recidivists" and "Possible 2nd Juvenile MVT/Hijacking Crew." **See** Exhibit 1, to be filed under seal pending Plaintiff's Motion.

52.     Each page of the document includes a header reading: "Law Enforcement Sensitive – For Official Use Only."

53.     The internal law enforcement document contained photographs, names, ages, identifying numbers, and home addresses of more than 30 juveniles, including some as young as ten years old.

54.     Of the approximately 30 youths published in these images, all are Black.

**55.**     Plaintiff Martese Tate's picture is listed among other photos under the heading "Possible 2nd MVT/Hijacking Crew." **See** Exhibit 2, to be filed under seal pending Plaintiff's Motion.

56.     Across Plaintiff Tate's picture, in large green highlight, it displays the highly sensitive and confidential medical information: "On Life Support." **See** Exhibit 3, to be filed under seal pending Plaintiff's Motion.

57.     The Doe Defendants shared these internal law enforcement documents with an amateur reporter named Donald Robinson who posts extensively on social media, and, upon information and belief, also shared these documents with other members of the public.

58.     As the Doe Defendants knew or should have known would occur, the law enforcement documents containing images of juveniles, private medical information, and inflammatory commentary that they disseminated were posted to social media and shared widely.

59.     Despite the fact that there are White juveniles, an unprotected class, who have committed repeated crimes—so-called "juvenile recidivists"—their photographs, ages, identifying information, medical conditions, and alleged crimes were not compiled in a law enforcement document and leaked to the public.

60.     The Doe Defendants shared this confidential information publicly with the intent to target these Black children and young adults.

61.     The dissemination of these internal records, exclusively of Black children and young adults, is part and parcel of, and caused by, the Chicago Police Department's systemic, unofficial policy, custom, and practice of using social media to express racially discriminatory views.

62.     Upon information and belief, a member or members of the Chicago Police Department, the Civilian Office of Police Accountability, and other City employees are aware of the identity of the officer or officers who leaked these documents.

63.     Upon information and belief, despite a Bureau of Internal Affairs ("BIA") investigation into the leak, no officer has come forward and taken responsibility,

64.     Officers' acquiescence to official wrongdoing occurred and occurs in conformity with CPD's code of silence, which emboldened officers to take the outrageous action of leaking prejudicial, inflammatory, sensitive information about Plaintiff Tate in the first place.

65.     These documents contained confidential, private, and highly sensitive medical information.

66.     On December 24, 2020, when Plaintiff Luellen became aware of the fact that Defendant Doe Officers had somehow retrieved this sensitive and private information, and shared it, Plaintiff Luellen experienced severe emotional distress, panic, and grief at this shocking violation of privacy.

67.     The documents leaked by Defendant Doe Officers were shared at least 400 times on Facebook and other social media platforms.

68.     In one instance of the sharing of the leaked, private information about Plaintiff Tate, a Facebook caption reads: BREAKING NEWS: I HAVE INFORMATION FROM **INSIDERS** THAT THESE ARE SOME OF THE PEOPLE INVOLVED IN THE VEHICLE HIJACKINGS AROUND THE CHICAGO AREA. I DO NOT CARE HOW OLD THEY ARE, BUT THESE FACES NEED TO BE EXPOSED. Y'ALL MIGHT KNOW THEIR FAMILY MEMBERS. GET AT THEM ABOUT THIS SHIT!! THESE ARE KIDS...THE YOUNGEST IS 10. (Emphasis added). **See** Exhibit 4, to be filed under seal pending Plaintiff's motion.

69.     The "insiders" who provided these sensitive confidential documents to the public for dissemination are members of the Chicago Police Department, the Defendant Doe Officers.

70.     Compounding her suffering, Plaintiff Luellen eventually learned that the pictures leaked by the Defendant Doe Officers had spread further—to Plaintiff Luellen's 8th grade daughter's Zoom class, in the hands of here teacher who showed them to students, including Plaintiff Tate's sister.

71.     Plaintiff Luellen first became aware of the fact that her son's sensitive medical information had been compiled, disclosed, and publicly shared when she viewed the Facebook posts on December 24, 2020, Christmas Eve.

72.     As a direct result of Defendant Doe Officers publicly disseminating this information, Plaintiff Luellen was faced with online comments about her and her son such as:

-       "Bring back the Death PENALTY and longer stiffer sentences for these lil bastards."

-       "This is ridiculous! Bad ass kids!! What happened to the one on life support?"

-       "I wish you could post the parents who failed these children."

-       "One of them shows ON LIFE SUPPORT omg."

- "Can I share this off your page I hope everyone get involved bout who they parents is and lock both they ass up for what they is doing and make they ass pay a find [sic] and if they own property out here put a hold or take it from them." **See** Exhibit 5.

73. Plaintiff Luellen experienced extreme psychological distress as a result of Defendant Doe Officers sharing Plaintiff Tate's medical status, photograph, and other information, which has manifested in part as nightmares, panic attacks, and other extreme physiological consequences.

74. On January 22, 2021, Plaintiff Luellen was contacted by the Chicago Police Department BIA Sergeant Holt regarding an active internal investigation into the matter.

75. On January 25, 2021, Plaintiff Luellen was again contacted by a separate member of the BIA, Sergeant Thomas Barker.

76. At a later date, Plaintiff received a mailed letter from Sergeant Barker asking to interview Plaintiff Luellen regarding "a complaint against a Department member" that is under investigation by the Chicago Police Department.

77. The BIA via Sergeant Barker has referred to this leak as "Priority #1" for internal affairs, highlighting the severity of the conduct.

78. The BIA via Sergeant Barker has stated that identifying the members of the Department who leaked these documents is critical because the dissemination of these documents and confidential information was "clearly against the law." According to Sergeant Barker, the BIA expects to "have to strip some officers" of their titles because of this egregious behavior.

79.     Despite the posturing by the BIA, and despite CPD's knowledge that these racially discriminatory and confidential materials were leaked from an internal source, upon information and belief, no one has been disciplined.

80.     Such lack of discipline demonstrates CPD's unlawful de facto policy of failing to respond to discriminatory conduct or take sufficient steps to prevent such actions, in accordance with its widespread policy, practice, and custom of failing to discipline officers who break law and department policy.

81.     Because the Defendant Doe Officers unlawfully shared this highly inflammatory and sensitive medical information, Plaintiff Kimberly Luellen has suffered from ongoing nightmares, panic attacks, and other extreme physiological consequences.

82.     Because of Plaintiff Luellen's multiple traumatizing encounters with the Chicago Police Department and their actions, she has been unable to work.

83.     Plaintiff Luellen has lost any trust in the Chicago Police Department—a department tasked with the protection and safety of Chicago's residents.

### The First Incident: Counts I-III and X-XII

**COUNT I: 42 U.S.C. § 1983 – Fourth Amendment**
**ILLEGAL ENTRY OF HOME AND UNREASONABLE MANNER OF ENTRY**
**Against Defendants David and Valdez by Plaintiff Luellen**

84.     Plaintiff Luellen hereby incorporates and realleges paragraphs one (1) through forty-four (44) as though fully set forth at this place.

85.     By reason of the conduct by Defendants, Plaintiff Luellen was deprived of rights, privileges, and immunities secured to her by the Fourth Amendment to the Constitution of the United States and laws enacted thereunder.

86.     The arbitrary intrusion by Defendants into the security and privacy of Plaintiff Luellen's home was not authorized by law.

87.     The Defendants violated Plaintiff Luellen's rights in the following manner on March 6, 2020: (1) they forced entry into Plaintiff's home; (2) they forcibly entered without knocking and announcing their office; (3) they gave Plaintiff no time to answer the door and (4) they caused excessive and unnecessary damage to Plaintiff's home and personal property; and (5) they undertook these actions without warrant, exigent circumstances, or consent.

88.     The foregoing actions were unnecessary, unreasonable, and excessive. These acts were in violation of Plaintiff Luellen's Fourth Amendment rights. Therefore, the Defendants in their individual capacity are liable to Plaintiff pursuant to 42 U.S.C. § 1983.

89.     There was no warrant obtained prior to Defendants' entry into the home.

90.     There were no exigent circumstances justifying Defendants' entry into the home.

91.     There was no other lawful justification for Defendants' entry into the home.

92.     The misconduct described in this Count was objectively unreasonable and was undertaken willfully and wantonly with reckless disregard for the rights and safety of Plaintiff Luellen.

93.     As a result of Defendant Officers' actions, Plaintiff Luellen has experienced lasting mental anguish, emotional trauma, panic attacks, paralyzing fear of the police, other physiological suffering, financial loss, and other devastating consequences that continue to impact her life.

WHEREFORE, Plaintiff Luellen demands judgment against Defendant Officers, jointly and severally, for compensatory damages, punitive damages, costs and attorneys' fees, and such other and additional relief as this Court deems equitable and just.

13

**COUNT II: 42 U.S.C. § 1983 – Fourteenth Amendment**
**VIOLATION OF EQUAL PROTECTION RIGHTS UNDER THE LAW**
**Against Defendants David and Valdez by Plaintiffs Luellen and Tate**

94.    Plaintiff Luellen hereby incorporates and realleges paragraphs one (1) through forty-four (44) as though fully set forth at this place.

95.    The Fourteenth Amendment to the United States Constitution, enforceable under 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

96.    Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on race and/or color is presumptively unconstitutional and subject to heightened scrutiny.

97.    Plaintiffs Martese Tate and Plaintiff Kimberly Luellen are or were Black and thus members of a protected class.

98.    Plaintiff Luellen's home was targeted based on Individual Defendants and CPD's racial animus and racial profiling, and Defendant Officers entered unlawfully and in flagrant violation of the Fourth Amendment, intentionally violating Plaintiff's equal protection rights. Similarly situated White individuals were not and are not profiled and did not and do not have their homes forcefully entered by Defendant Officers without probable cause.

99.    In addition to the events of March 6, 2020, Officer David and Officer Valdez targeted Plaintiff Luellen's home, profiling her son Plaintiff Tate on the basis of her and her son's race on at least one other occasion.

100.    Upon information and belief, White residents in their homes did not and do not have their back doors unreasonably kicked in when the only available description of the suspect is a "juvenile with a headband."

101.     Defendants treat Black individuals differently than White individuals, evinced in their policing of Plaintiff Luellen and her son, Plaintiff Tate.

102.      Defendant Officers acted with intent to treat Plaintiff Luellen and Plaintiff Tate disparately on the basis of their race, violating their Fourteenth Amendment right of equal protection guaranteed under the U.S. Constitution, and thus violating Plaintiffs' rights guaranteed under 42 U.S.C. § 1983.

103.     Defendant Officers' actions as alleged herein were motivated by racial animus.

104.     The misconduct described in this Count was objectively unreasonable and was undertaken willfully and wantonly with reckless disregard for the rights and safety of Plaintiffs.

105.     The aforementioned actions of Defendant Officers on March 6, 2020 caused Plaintiff Luellen to experience lasting mental anguish, emotional trauma, panic attacks, paralyzing fear of the police, other physiological suffering, damage to property, financial loss, and other devastating consequences that continue to impact her life.

WHEREFORE, Plaintiff Luellen demands judgment against Defendant Officers, jointly and severally, for compensatory damages, punitive damages, costs and attorneys' fees, and such other and additional relief as this Court deems equitable and just.

### COUNT III: 42 U.S.C. 1983 and 1985
### CIVIL CONSPIRACY
### Against Defendants David and Valdez by Plaintiffs Luellen and Tate

106.     Plaintiff Luellen hereby incorporates and realleges paragraphs one (1) through forty-four (44) as though fully set forth at this place.

107.     Defendant Officers expressly or impliedly formed an agreement to unlawfully enter Plaintiff Luellen's home, in violation of her constitutional rights, on the day they entered the home.

108.     In furtherance of this conspiracy, Defendants took the overt acts of jointly entering a home absent any lawful justification.

109.     Furthermore, Defendants' expressly or impliedly agreed-upon targeting of and entry into the home constitutes a violation of Plaintiffs' equal protection rights under the Fourteenth Amendment.

110.     The misconduct described in this Count was objectively unreasonable and was undertaken willfully and wantonly with reckless disregard for the rights and safety of Plaintiffs.

111.     As a result of this conspiracy to deprive Plaintiff Luellen and Plaintiff Tate of their constitutional rights, Plaintiff was injured in the form of experiencing lasting mental anguish, emotional trauma, panic attacks, paralyzing fear of the police, other physiological suffering, financial loss, and other devastating consequences that continue to impact her life.

WHEREFORE, Plaintiff Luellen, on behalf of herself and Plaintiff Tate, demands judgment against Defendant Officers, jointly and severally, for compensatory damages, punitive damages, costs and attorneys' fees, and such other and additional relief as this Court deems equitable and just.

### The Second Incident: Counts IV-XII

**COUNT IV: 42 U.S.C. § 1983**
**EQUAL PROTECTION**
**Against J. Doe Officers 1-5 by Plaintiff Luellen on behalf of Plaintiff Tate**

112.     Plaintiff Luellen hereby incorporates and realleges paragraphs one (1) through eleven (11) and forty-five (45) through eighty-three (83) as though fully set forth at this place.

113.     The Fourteenth Amendment to the United States Constitution, enforceable under 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the

16

equal protection of the laws." U.S. Const. amend. XIV, § 1. Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on color is presumptively unconstitutional and subject to heightened scrutiny.

114.    Plaintiff Tate is Black, thus a member of a protected class during his life.

115.    Plaintiff Tate's highly sensitive and confidential medical and identifying information was compiled and released by the Defendant Doe Officers with the intent to target Plaintiff on the basis of race, intentionally violating Plaintiff's equal protection rights.

116.    In the entirety of the dozens of children and juveniles' pictures and confidential information leaked by Defendant Doe Officers to the public, not a single individual was White.

117.    Upon information and belief, similarly situated White individuals did not and do not have their highly confidential medical information maliciously shared and disseminated to the Internet by Chicago police officers.

118.    Defendant Doe Officers compiled these internal documents, targeted Plaintiff Tate and other Black children and juveniles, and leaked the information for public consumption, fueled by racial bias and animus and with the aim of prejudicing the public against Black individuals.

119.    Defendant Doe Officers acted with intent to treat Plaintiff Tate disparately on the basis of Plaintiff's race, violating Plaintiff's Fourteenth Amendment right of equal protection guaranteed under the U.S. Constitution, and thus violating his rights guaranteed under 42 U.S.C. § 1983.

120.    The misconduct described in this Count was objectively unreasonable and was undertaken willfully and wantonly with reckless disregard for the rights and safety of Plaintiff Tate.

121.    The aforementioned actions of Defendant Doe Officers through the release of highly sensitive law enforcement documents were the direct and proximate cause of the constitutional violations set forth above and of the Plaintiff Tate's injuries, including the invasion of his privacy, loss of reputation, and exposure to public humiliation and shame.

WHEREFORE, Plaintiff Luellen, on behalf of Plaintiff Tate, demands judgment against Defendant Doe Officers, jointly and severally, for compensatory damages, punitive damages, costs and attorneys' fees, and such other and additional relief as this Court deems equitable and just.

**COUNT V: 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT**
**SUBSTANTIVE DUE PROCESS RIGHT TO PRIVACY**
**Against J. Doe Officers 1-5 by Plaintiff Luellen on behalf of Plaintiff Tate**

122.    Plaintiff Luellen hereby incorporates and realleges paragraphs one (1) through eleven (11) and forty-five (45) through eighty-three (83) as though fully set forth at this place.

123.    The Doe Defendants obtained, disclosed, and shared Plaintiff Martese Tate's highly sensitive medical information and alleged criminal misconduct.

124.    The Fourteenth Amendment to the U.S. Constitution protects Plaintiff Tate's right to privacy.

125.    The Court of Appeals for the Seventh Circuit recognizes the constitutional right to the privacy of medical information. *Wolfe v. Schaefer*, 619 F.3d 782, 783 (7th Cir. 2010).

126.    The Doe Defendants used their positions of power and trust to invade and violate Plaintiff Tate's constitutional right to privacy.

127.    Plaintiff Tate has a fundamental liberty interest in keeping confidential medical information private. There was no significant governmental interest in the disclosure of the Plaintiff Tate's life support status and confidential medical information to the public, and the

unjustified disclosure of said information by J. Doe Officers under color of state law violated the Plaintiff Tate's substantive Due Process rights under the Constitution of the United States.

128.    Through their involvement in gathering and disseminating Plaintiff Tate's confidential medical information, Doe Defendants were personally responsible for the deprivation of Plaintiff Tate's constitutional rights.

129.    The aforementioned actions of Doe Defendants through the creation and release of highly sensitive law enforcement documents containing private medical information were the direct and proximate cause of the constitutional violations set forth above and of the Plaintiff's injuries.

130.    J. Doe Defendants' actions were undertaken willfully and wantonly with reckless disregard for the rights and safety of Plaintiff Tate.

WHEREFORE, Plaintiff Luellen, on behalf of Plaintiff Tate, demands judgment against Doe Officers, jointly and severally, for compensatory damages, punitive damages, costs and attorneys' fees, and such other and additional relief as this Court deems equitable and just.

### COUNT VI: STATE LAW CLAIM
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Against J. Doe Officers 1-5 by Plaintiff Luellen

131.    Plaintiff Luellen hereby incorporates and realleges paragraphs forty-four (44) through eighty-three (83) as though fully set forth at this place.

132.    The actions, omissions, and conduct of the Doe Defendants—including but not limited to the public dissemination of highly sensitive medical information and prejudicial and inflammatory supposition regarding criminal activity—were extreme and outrageous and exceeded all bounds of human decency. These actions were rooted in an abuse of power and authority, and racial animus.

133.    J. Doe Defendants' actions, omissions, and conduct above were undertaken with the intent to inflict and cause severe emotional distress to Plaintiff Luellen, with the knowledge of the high probability that their conduct would cause such distress, or in reckless disregard of the probability that their actions would cause such distress.

134.    J. Doe Defendants, who occupied positions of special trust and authority by virtue of their status as police officers, knew or had reason to know or believe that Plaintiff Luellen was especially vulnerable and fragile in light of her child's medical status.

135.    J. Doe Defendants' actions were undertaken willfully and wantonly with reckless disregard for the rights and safety of Plaintiff Luellen.

136.    As a direct and proximate result of the J. Doe Defendants' extreme and outrageous conduct, Plaintiff Luellen suffered and continues to suffer long-term, severe emotional distress and trauma, which manifests in physical symptoms including severe anxiety, chronic insomnia and debilitating panic attacks.

WHEREFORE, Plaintiff Luellen demands judgment against Defendant Officers, jointly and severally, for compensatory damages, punitive damages, costs, and such other and additional relief as this Court deems equitable and just.

### COUNT VII: STATE LAW CLAIM
### NEGLIGENT (RECKLESS) INFLICTION OF EMOTIONAL DISTRESS
### Against J. Doe Officers 1-5 by Plaintiff Luellen

137.    Plaintiff Luellen hereby incorporates and realleges paragraphs one (1) through eleven (11) and forty-five (45) through eighty-three (83) as though fully set forth at this place.

138.    The actions, omissions and conduct of the Doe Defendants set forth above were extreme and outrageous and exceeded all bounds of human decency.

139. In particular, the conduct of J. Doe Defendants in publicly sharing Plaintiff Tate's confidential medical information and alleged criminal associations caused Plaintiff Luellen severe emotional distress and ongoing physiological effects such as insomnia and panic attacks.

140. The conduct of the Doe Defendants showed an utter indifference to or conscious disregard for the safety and well-being of Plaintiff Luellen.

141. The Defendant Chicago Police Officers owed Plaintiffs a duty of care that they breached when they shared this highly upsetting medical information with the public. Defendant Doe Officers' actions, omissions and conduct demonstrate that it was taken with the intent to inflict and cause severe emotional distress.

142. In the alternative, at the very least, the actions were taken with the knowledge of the high probability that their conduct would cause such distress, or in reckless disregard of the probability that their actions would cause such distress.

143. Plaintiff Luellen is a direct victim of Defendant Chicago Police Officers' negligent infliction of emotional distress.

144. J. Doe Defendants' actions were undertaken willfully and wantonly with reckless disregard for the rights and safety of Plaintiff Luellen.

145. J. Doe Defendants' actions were the proximate cause of Plaintiff Luellen's injuries and her extreme, severe, long-term emotional distress, trauma, and ongoing physiological symptoms including panic attacks and chronic insomnia.

WHEREFORE, Plaintiff Luellen demands judgment against Defendant Officers, jointly and severally, for compensatory damages, punitive damages, costs, and such other and additional relief as this Court deems equitable and just.

**COUNT VIII: STATE LAW CLAIM**
**INVASION OF PRIVACY BY PUBLIC DISCLOSURE OF PRIVATE FACTS**
**Against J. Doe CPD Officers 1-5 by Plaintiffs Luellen and Tate**

146.     Plaintiff Luellen hereby incorporates and realleges paragraphs one (1) through eleven (11) and forty-five (45) through eighty-three (83) as though fully set forth at this place.

147.     J. Doe Defendants disclosed and shared with the public Plaintiff Tate's highly sensitive medical information and alleged criminal misconduct.

148.     The disclosure and public dissemination of one's sensitive medical information, and the sensitive medical information of one's permanently incapacitated and now deceased child, to the public is highly offensive to a person of reasonable sensibilities.

149.     The disclosure and public dissemination of criminal allegations not yet proven by law enforcement is highly offensive to a person of reasonable sensibilities.

150.     The above-actions have substantially interfered with Plaintiff Luellen's daily life and were the proximate cause of Plaintiff Luellen's injuries and her extreme, severe, long-term emotional distress, trauma, and ongoing physiological symptoms including panic attacks and chronic insomnia.

151.     The above-actions damaged the reputation of Plaintiff Tate.

152.     The above actions are in violation of the Illinois tort of public disclosure of private facts.

153.     J. Doe Defendants' actions were undertaken willfully and wantonly with reckless disregard for the rights and safety of Plaintiff Tate.

WHEREFORE, Plaintiff Luellen, on behalf of herself and on behalf of Plaintiff Tate, demands judgment against Defendant Officers, jointly and severally, for compensatory damages,

punitive damages, costs, and such other and additional relief as this Court deems equitable and just.

## COUNT IX: STATE LAW CLAIM
## INVASION OF PRIVACY BY INTRUSION UPON SECLUSION
### Against J. Doe Officers 1-5 by Plaintiffs Luellen and Tate

154.    Plaintiff Luellen hereby incorporates and realleges paragraphs one (1) through eleven (11) and forty-five (45) through eighty-three (83) as though fully set forth at this place.

155.    It is a violation of Illinois law to invade another's privacy by unreasonable Intrusion upon Seclusion.

156.    Doe Defendants' intrusion into Plaintiff Tate's privacy by accessing his private medical information, without Plaintiff Tate's consent or knowledge, while Plaintiff Luellen was in an extremely vulnerable and emotionally devastating place, would be highly offensive or objectionable to a reasonable person.

157.    Plaintiff Tate had a reasonable expectation of privacy and confidentiality in private medical documents.

158.    There was no legitimate state interest in Defendant Doe Officers covertly accessing and disseminating Plaintiff Tate's medical information, nor was there any legally adequate or justifiable reason to do to.

159.    In committing the acts alleged in the preceding paragraphs, Defendant Doe Officers were using the power granted to them as agents of the City of Chicago Police Department and were acting at all relevant times within the scope of their employment.

160.    The above actions were taken willfully and wantonly and with reckless disregard for the rights of Plaintiffs.

161.    J. Doe Defendants' actions were the proximate cause of Plaintiff Luellen's injuries and her extreme, severe, long-term emotional distress, trauma, and ongoing physiological symptoms including panic attacks and chronic insomnia.

162.    J. Doe Defendants' actions damaged the reputation to Plaintiff Tate.

WHEREFORE, Plaintiff Luellen, on behalf herself and on behalf of Plaintiff Tate, demands judgment against Defendant Officers, jointly and severally, for compensatory damages, punitive damages, costs, and such other and additional relief as this Court deems equitable and just.

### COUNT X: 42 U.S.C. § 1983 - *MONELL* LIABILITY
### Against Defendant City of Chicago by Plaintiffs Luellen and Tate

163.    Plaintiff Luellen hereby incorporates and realleges paragraphs one (1) through eighty-three (83) as though fully set forth at this place.

164.    The City of Chicago, through the Chicago Police Department, has a de facto policy, custom, and widespread practice of using social media to share racially discriminatory views.

165.    The City of Chicago, through the Chicago Police Department has a de facto policy, custom, and widespread practice of engaging in racially biased policing and violating the constitutional rights of protected classes of people.

166.    The 2017 United States Department of Justice investigation of the CPD concluded, among other things, that in response to "discriminatory views and intolerance with regard to race, religion, gender, and national origin in public social media forums," CPD fails to take appropriate steps to prevent or respond to this animus. United States Department of Justice Civil Rights Division & United States Attorney's Office Northern District of Illinois,

*Investigation of the Chicago Police Department* 147 (Jan. 2017), https://perma.cc/JZ6Q-659Y
(DOJ Report).

167.     Additionally, the 2016 report of the mayoral Chicago Police Accountability Task
Force found, among other starting conclusions, that there are "daily, pervasive transgressions"
regarding Fourth Amendment violations, specifically targeting Black and Latino communities in
Chicago. Police Accountability Task Force, *Recommendations for Reform: Restoring Trust
Between the Chicago Police and the Communities They Serve* 4 (April 2016),
https://perma.cc/7DNJ-8QMP (PATF Report).

168.     Despite clear, actual notice of these findings, CPD and the City did not and have
not subsequently implemented any changes in CPD policy, procedure, or training in order to
remedy or otherwise address officers' widespread practice of racially biased policing and social
media use, despite the one sentence agreement to do so in the federal consent decree agreed to by
the City with the State of Illinois, entered by District Judge Robert Dow in January, 2019 in *State
of Illinois v. City of Chicago*, 17-cv-6260, https://perma.cc/2H6E-ASB8 (Consent Decree).

169.     Directly relevant to the facts of this case, and the CPD's code of silence, the
Independent Monitoring Team's Special Report: The City of Chicago's and the Chicago Police
Department's Responses to Protests and Unrest under the Consent Decree (May 2020 –
November 2020) released on July 20, 2021, found that there have been an unprecedented number
of complaints to COPA regarding officers concealing their identities and the identities of fellow
officers, and the use of racial and derogatory slurs in policing. *State of Illinois v. City of Chicago*,
17-cv-6260, https://perma.cc/F25M-77C2 at 8.

170. Defendant Officers' misconduct was directly and proximately caused by one or more of the following specific, long-standing, interrelated, customs, failures of official policy, lack of official policy, and de facto policies and practices identified in paragraph 173.

171. Each of these policies existed for more than ten years prior to March 6, 2020 and the timeframe during which Plaintiff Tate's confidential information was disclosed and racially discriminatory internal documents were released and was the moving force behind the officers' conduct that resulted in the violation of Plaintiff Tate and Plaintiff Luellen's constitutional rights and is the direct causal link between the City's action/inaction and the deprivation of Plaintiffs' rights.

172. The City had actual and constructive notice during the each of the following failures of official accountability from a) a long-standing, continual stream of citizen misconduct reports to COPA b) the specific conclusions reached by and the data contained in the 2017 DOJ and the 2016 PATF reports (see supra) (c) BIA investigations into the exact incident included herein (d) the Independent Monitoring Team's Special Report: The City of Chicago's and the Chicago Police Department's Responses to Protests and Unrest under the Consent Decree (May 2020 – November 2020) and (e) multiple historical and well documented instances of the Chicago Police Department passing sensitive internal information to outside sources, including, for example, organized crime syndicates, i.e., the mob. *See, e.g.*, "Crime, Corruption, and Cover-ups in the Chicago Police Department," University of Illinois at Chicago Department of Political Science personnel, 2013 https://perma.cc/ZQ8Z-RLQH.

173. Based on this comprehensive documentation kept and maintained by the Defendant City of Chicago, it is the custom, practice, and policy of the City of Chicago and its agents to perform the following acts and/or omissions in connection with and causing

unreasonable entry into homes, the unlawful dissemination of confidential information, persistent racially biased policing, and racially discriminatory social media use:

a. Fail to train, supervise, monitor, discipline, counsel and/or otherwise maintain control of police officers who have committed an unreasonable and warrantless entry into a home;

b. Fail to properly investigate a complaint alleging unreasonable entry into a home;

c. Fail to take proper remedial action against a Chicago police officer once it is determined that he/she has committed an unreasonable entry or other Fourth Amendment violation;

d. Fail to provide adequate sanctions/discipline to officers who falsify probable cause reports, causing said officers to believe that they can manufacture justification which will cause them to not be disciplined or significantly disciplined for engaging in illegal behavior, inter alia violation of individuals constitutional rights;

e. Corroborate falsified exigent circumstances to cover-up for the misconduct of fellow police officers;

f. Refuse to disobey the code of silence and reveal the identities of officers involved in leaked confidential information;

g. Engage in the misrepresentation of facts with regards to the unreasonable and warrantless search of a home and destruction of property, to wit, a doorframe and door;

h. Allow misconduct to occur in various types and severity such that police officers believe they can share confidential information, misrepresent facts to cover up Fourth Amendment violations, engage significant intrusions to Black individuals' privacy and sensitive medical facts without repercussions and/or significant repercussions;

      i.      Fail to properly investigate officers who enter homes with force, without a warrant, without exigent circumstances, and failure to conduct investigations and/or internal investigations, causing said officers to believe that they can manufacture evidence which will cause them not to be disciplined or significantly disciplined for engaging in behavior which violates the rules, polices, and/or procedures of the Chicago Police Department;

      j.      Fail to properly review the investigations of police officers and in the scenario that such review is conducted, it is done in an inefficient, lengthy and overall poorly executed manner;

      k.      Fail to properly train mid-level officers in the investigatory procedures and techniques necessary to reprimand and/or oversee the actions of lower level officers, the lack of which results in the development of sensitive citizen investigations with little to no oversight by higher ranked officers and the public dissemination of highly confidential law enforcement documents;

      l.      Fail to provide proper training to prevent officers from misrepresenting facts, manufacturing exigent circumstances, causing significant intrusions to the privacy of innocent citizens, and/or committing unconstitutional searches and seizures, thus violating the rules, policies and procedures of the Chicago Police Department; and

      m.      Fail to properly discipline employees who acknowledge misdeeds without a lengthy and otherwise poorly executed investigation.

      174.    The actions of the Defendant Officers, as alleged above, were pursuant to and caused by one or more policies, practices, and customs of the City of Chicago through the Chicago Police Department.

175. These practices and customs were maintained and implemented unreasonably, with deliberate indifference to an obvious need, and in a manner that shocks the conscience, and were separately and together, a direct and proximate cause of the unconstitutional acts committed by the Defendant-Officers against the Plaintiff.

WHEREFORE, Plaintiff Luellen, on her own and behalf of Plaintiff Tate, demands judgment against the City of Chicago, for compensatory damages, punitive damages, costs and attorneys' fees, and such other and additional relief as this Court deems equitable and just.

## COUNT XI: STATE LAW CLAIM
### *RESPONDEAT SUPERIOR*
**Against Defendant City of Chicago by Plaintiffs Luellen and Tate**

176. Plaintiffs hereby incorporate and reallege paragraphs one (1) through eighty-three (83) as though fully set forth at this place.

177. Defendants J. Doe Officers 1-5 involved in the compilation and dissemination of private, sensitive medical information about Martese Tate were acting in the scope of their employment and as agents of their employer the City of Chicago.

178. The City of Chicago is liable for the acts of its agents and employees, and is therefore liable for Intentional Infliction of Emotional Distress, Negligent (Reckless) Infliction of Emotional Distress, Public Disclosure of Private Facts, Intrusion into Seclusion, and any other state law claims arise out of the occurrences that are the subject of this Complaint.

179. As a direct and proximate cause of Defendant Officers' unlawful acts, which occurred within the scope of their employment activities, Plaintiffs were damaged, including lasting mental anguish, reputational damage, emotional trauma, panic attacks, paralyzing fear of the police, other physiological suffering, and various devastating consequences that continue to impact their lives.

WHEREFORE, Plaintiff Luellen, on her own behalf and on behalf of Plaintiff Tate, demands judgment against the City of Chicago for compensatory damages, punitive damages, costs, and such other and additional relief as this Court deems equitable and just.

### COUNT XII: STATE LAW CLAIM
### 745 ILCS 10/9-102 – INDEMNIFICATION
### Against Defendant City of Chicago by Plaintiffs Luellen and Tate

180.     Plaintiff Luellen hereby incorporates and realleges paragraphs one (1) through eighty-three (83) as though fully set forth at this place.

181.     Defendant City of Chicago is the employer of the individual Defendant Officers.

182.     The individual Defendant Officers committed the above-alleged acts under color of law and in the scope of their duties and employment as employees of the City of Chicago

183.     In Illinois, public entities are directed to pay for any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities. 745 ILCS 10/9-102.

184.     As a direct and proximate cause of Defendant Officers' unlawful acts, which occurred within the scope of their employment activities, Plaintiffs were damaged, including lasting mental anguish, emotional trauma, panic attacks, damage to reputation, paralyzing fear of the police, other physiological suffering, and various devastating consequences that continue to impact her life.

WHEREFORE, Plaintiff Luellen, on her own behalf and on behalf of Plaintiff Tate, demands judgment against Defendant Officers, jointly and severally, for compensatory damages, punitive damages, costs, and such other and additional relief as this Court deems equitable and just.

PLAINTIFF DEMANDS TRIAL BY JURY.

Respectfully Submitted,

/s/ Daniel Massoglia

*One of Plaintiff's Attorneys*

Ashley Rodriguez (#6333251)
Daniel Massoglia (#6317393)
First Defense Legal Aid
601 S. California Ave.
Chicago, IL 60612
P: 708-797-3066
E: ashley@first-defense.org
E: daniel@first-defense.org

# EXHIBIT 1

To be filed under seal pending motion of Plaintiff.

# EXHIBIT 2

To be filed under seal pending motion of Plaintiff.

# EXHIBIT 3

To be filed under seal pending motion of Plaintiff.

# EXHIBIT 4

To be filed under seal pending motion of Plaintiff.

# EXHIBIT 5

5:01

Donald's Post

**Comments**                                    Done

---

 This is ridiculous! Bad ass kids!! What happened to the one on life support?

8h    **Like**    **Reply**

 

8h    **Like**    **Reply**

 I wish you could post the parents who failed these children 😔

8h    **Like**    **Reply**                         5

**View 1 previous reply...**

**Maria Vellutini** some of the time it's not the parent, it's the kid, and some of the time it's the parent just not being parents, smh

6h    **Like**    **Reply**                         1

@Robin it's never "just the kid" that's like saying some flowers don't grow because it's just the flower when in reality it's its environment and how that person cares for it

4h    **Like**    **Reply**                         4

---

    Write a comment...                


5:01

< Donald's Post

**Comments** Done



Bring back the Death PENALTY and longer stiffer sentences for these lil bastards

5h    Like    Reply



The fact that you think a death penalty or long prison sentence is going to fix something is sad.

4h    Like    Reply

Write a reply...



I wish we could also find the adults who are grooming these children for crime. There has to be a chop shop out there with affiliations to this.

5h    Like    Reply                    👍 2



it's not about a chop shop. The cars are used for a few days in other crimes.

5h    Like    Reply



Wow! Damn Shame!

5h    Like    Reply

 Write a comment...      

5:01

Donald's Post

## Comments                    Done

4h   Like   Reply   

 One of them shows ON LIFE SUPPORT omg

4h   Like   Reply

 Some of them look like babies this is ridiculous

3h   Like   Reply   👍 1

 Omg

3h   Like   Reply

 Can I share this off your page I hope everyone get involved bout who they parents is and lock both they ass up for what they is doing and make they ass pay a find and if they own property out here put a hold or take it from them

2h   Like   Reply

 So sad



📷   Write a comment...